OPINION
{¶ 1} The defendant-appellant, Donald Malone, III, appeals the judgment of conviction and sentence filed by the Marion County Common Pleas Court.
 {¶ 2} On April 19, 2006, the Marion County Grand Jury filed a nine-count indictment against Malone, charging the following offenses: Counts One and Three, rape, violations of R.C. 2907.02(A)(2), first-degree felonies; Count Two, kidnapping, a violation of R.C.2905.01(A)(4), a first-degree felony;[1] Count Four, abduction, a violation of R.C. 2905.05(A)(2), a third-degree felony; Counts Five, Six, and Seven, intimidation of an attorney, victim, or witness in a criminal case, violations of R.C. 2921.04(B), third-degree felonies; Count Eight, tampering with evidence, a violation of R.C. 2921.12(A)(1), a third-degree felony; and Count Nine, possessing criminal tools, a violation of R.C. 2923.24(A), a fifth-degree felony. These charges resulted from an incident that occurred during the night and into the morning on April 8-9, 2006.
 {¶ 3} On April 8, 2006, Brittany Brown invited the victim, L.K., and her friend, Hugh Pfarr, to the apartment shared by Brittany and her husband, Brad Brown. L.K., Hugh, and Brad are clients of the Marion Area Counseling Center West ("MACC West"). L.K. was a client because she is bi-polar, suffers from borderline personality, and engages in impulsive behaviors. L.K. and Hugh lived *Page 4 
at MACC West, but Brad and Brittany's apartment was located in the city of Marion. When Brittany, L.K., and Hugh arrived at the apartment, they met Brad and Malone, who was introduced as "Demon." Malone had his own bedroom in the apartment because he resided there when he fought with his mother and did not want to stay in her home. Malone was nicknamed "Demon" because he was a founder of and a priest in a satanic "covenant" located in Orange County, California.
 {¶ 4} Throughout the early evening, the group laughed and joked, talking about various topics, including sex. Malone talked about his former fiancé, who was deceased, and also talked about several girls he had had relationships with. Malone showed pictures of the girls to the group and talked about wanting to kill them. Eventually, Brad and Hugh left the apartment, and Hugh returned to his residence at MACC West. While Brad was gone, Brittany, L.K., and Malone continued to joke about various topics, some of which were of a sexual nature. At approximately 11:00 p.m., L.K. decided to spend the night at the apartment, intending to sleep on the couch in the living room. L.K. laid down on the couch, draping her legs across Malone's lap. Malone asked her if he could lie with her, and she apparently consented, so he rested on the couch behind her, placing his head on her hip and holding her legs. After a short time, L.K. indicated she was *Page 5 
uncomfortable, and she changed her position on the couch. Malone rested his head on her inner thigh and continued rubbing her legs. During this time, Brittany was cleaning up the apartment and moving between rooms. L.K. again indicated that she was uncomfortable, and she went into Brad and Brittany's bedroom. Brittany joined her in the bedroom, and the two women played with several kittens on the bed.
 {¶ 5} Malone went to his bedroom, and eventually called Brittany to him. In his room, Malone told Brittany that he wanted to have sex with L.K., and he told Brittany he would kill her and/or L.K. if they resisted. During this time, Malone was holding an unsheathed knife, which he always kept on his person. Brittany began to cry and went back to her bedroom, where she told L.K. that Malone wanted to have sex with her. L.K. also began to cry and said she did not want to have sex with Malone, but Brittany told her there would be consequences if she did not comply. Malone walked into the bedroom and sat on a chair, holding his unsheathed knife. Malone told Brittany to leave the room and prevented L.K. from leaving. He told L.K. to give him what he wanted, and then she could leave. Holding his knife in front of her, Malone told L.K. he would kill her if she failed to cooperate. L.K. decided to "go ahead and get it over with," so she followed Malone to his bedroom. *Page 6 
 {¶ 6} In the bedroom, Malone told her to undress, and then he took off his clothes. Malone told L.K. to lie on the bed, and he attempted to insert his penis into her vagina. Failing to do so, he licked her vagina and noted that she had a "fat pussy." Malone then used Vaseline as a lubricant and had vaginal intercourse with L.K. . After Malone ejaculated in L.K.'s vagina, she got dressed, and Malone made her go into the bathroom. In the bathroom, Malone told L.K. to take a shower to get rid of any evidence. He filled a mustard bottle with warm water, and made her insert the tip of the bottle into her vagina to douche. After she douched with the mustard bottle, Malone took the bottle, inserted it into her vagina and squeezed the bottle one more time. During this time, Malone had his knife with him. Malone then threatened L.K. that he or his "dudes" would kill her and/or her mother if she told anybody about the rape. While L.K. was in the shower, Brad returned to the apartment. Malone went out to see who was in the apartment and told Brad, "I raped the bitch."
 {¶ 7} When they got out of the bathroom, L.K. went into Brad and Brittany's bedroom. Malone followed her into the bedroom and again threatened to kill her if she told the police. He also threatened Brad and Brittany and told them that if any police or attorneys asked about the rape, they were to say they had been asleep and had no knowledge. Malone then went into the kitchen and made fried chicken. Brad and Brittany ate some of the chicken while L.K. remained in *Page 7 
the bedroom. Brad and Brittany returned to the bedroom, and Malone entered a short time later, carrying the sheets from his bed, the mustard bottle, and Vaseline in a plastic bag, which he put in his backpack. Malone stated he was going to LaRue to burn the evidence. After Malone left the apartment, L.K. fell asleep in Brad and Brittany's bed. When she awoke, she left the apartment and returned to her apartment at MACC West.
 {¶ 8} After Malone left the apartment, he was stopped by a city police officer for jaywalking. Malone identified himself to the officer and consented to a search of his bag. Malone told the officer that he carried the bedsheet so he could lie down if he got tired, he had the mustard bottle for drinking water, and he had the Vaseline in case his thighs got chafed from walking. The officer found his story strange, but having no reason for an arrest, he let Malone go on his way.
 {¶ 9} On April 10, 2006, L.K. reported the incident to the police and was examined by a sexual assault nurse at a local hospital. Officers investigated at Brad and Brittany's apartment, where they placed Malone under arrest. As part of their investigation, officers seized a calendar on which Malone had written "demon night" on April 8.
 {¶ l0} The court conducted a four day jury trial in July 2006. For its case in chief, the state presented testimony from Rob Musser, the officer who stopped Malone and searched his backpack; L.K.; Brittany; Hugh; Amy Stander, a friend *Page 8 
of L.K.'s; Judy Fatzinger-Spengler, L.K.'s mother; Linda Henson, L.K.'s case manager at MACC West; Betsy Abbott, a victim's advocate; Darlene Schoonard, the nurse who completed the sexual assault examination; James Fitsko, the detective who conducted a photo line-up with L.K.; and Electa Foster, the officer who investigated the offenses. The court admitted the following exhibits into evidence: Malone's knife, Malone's backpack, L.K.'s sweatpants, L.K.'s t-shirt, Malone's calendar, six photographs of Brad and Brittany's apartment, three photographs of the girls Malone had talked about killing, the nurse's report from the sexual assault exam, and the photos from the line-up. Malone testified on his own behalf and presented Brad's testimony. Finally, in rebuttal, the state presented testimony from Jeffrey Brown, Brad's father, and additional testimony from Electa Foster.
 {¶ 11} The jury convicted Malone on both counts of rape, two counts of intimidation, one count of kidnapping with a sexual motivation specification, one count of tampering with evidence, and one count of possessing criminal tools. Malone withdrew his request for a jury trial and pled guilty on the sexually violent predator specifications on counts one, two, and three. The state dismissed the kidnapping charge since it was an allied offense of similar import, opting to retain the rape conviction in count one. *Page 9 
 {¶ 12} Malone waived his right to a pre-sentence investigation report and requested that the court impose an agreed sentencing recommendation of 25 years to life in prison. The court sentenced Malone to a mandatory term of ten years to life on count one with the sexually violent predator specification; a mandatory term of ten years to life on count three with the sexually violent predator specification; five years on count five; five years on count six; five years on count eight; and twelve months on count nine. The court ordered that the sentences imposed on counts one and three be served consecutively; that the sentences on counts five, six, eight, and nine be served concurrently to each other; and the concurrent sentences imposed on counts five, six, eight, and nine be served consecutively to the consecutive sentences imposed on counts one and three. The court's order resulted in an aggregate sentence of 25 years to life. Malone appeals the judgment of the trial court, asserting two assignments of error for our review.
 First Assignment of Error Defendant-Appellant's convictions for rape, kidnapping, intimidation, and possession of criminal tools are contrary to the manifest weight of the evidence.
 Second Assignment of Error Defendant-Appellant's conviction for tampering with evidence is contrary to the manifest weight of the evidence.
 {¶ 13} When a court of appeals reviews a conviction based on the manifest weight of the evidence, the "court sits as a `"thirteenth juror."' State v. *Page 10 Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, quotingTibbs v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211,72 L.Ed.2d 652.
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.)
Thompkins, at 377, quoting Black's Law Dictionary (6th
Ed.1990), at 1594. When an appellant challenges a conviction under the weight of the evidence, the court must review the entire record, weigh the evidence and "all reasonable inferences," consider witness credibility, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, at 377, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. To reverse a conviction based on the manifest weight of the evidence, a unanimous panel of three appellate judges must concur. State v.Michaels, 3d Dist. No. 13-99-41, 1999-Ohio-958, citingThompkins, at 389. Under this standard, we must determine whether each conviction is against the manifest weight of the evidence. Although Malone has asserted two assignments of error, they may be considered together. *Page 11 
 {¶ 14} The grand jury indicted, and the jury convicted, Malone on two counts of rape. R.C. 2907.02(A)(2) states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Sexual conduct is defined as:
 vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.
R.C. 2907.01(A). In count one, Malone was charged with engaging in vaginal intercourse with L.K. after compelling her to submit by force or the threat of force. In count three, Malone was charged for inserting an object (the mustard bottle) into L.K.'s vaginal opening and for using force or the threat of force to make L.K. insert an object (the mustard bottle) into her vaginal opening three times.
 {¶ 15} Despite all the testimony at trial, the issue of whether sexual conduct occurred boiled down to a question of credibility between L.K. and Malone. As to count one, L.K. and Malone both testified that they engaged in vaginal intercourse. Their testimony was substantially similar in that both testified that Malone was unable to penetrate her vagina on the first attempt and that he used some type of lubrication to enable penetration on his successful attempt. As to count three, L.K. testified that while she was in the shower, Malone filled an empty mustard bottle *Page 12 
with warm water and required her to douche. She stated that she inserted the bottle into her vagina three times. She also testified that Malone inserted the bottle into her vagina and flushed it with warm water to clean out any "evidence" of his semen.
 {¶ 16} Malone testified that he and L.K. showered together to bathe and "wash up." On cross-examination, Malone admitted he was in possession of a mustard bottle on the night of April 8 — April 9. However, Malone explained that he had had sex with a different woman on April 7, and during that encounter, Malone had rinsed out the mustard bottle, asked the woman to urinate in it, and then drank her urine.
 {¶ 17} There was also circumstantial evidence about the mustard bottle. Brittany testified that she saw Malone put a "mayonnaise" bottle in his backpack before he left the apartment. Brittany also testified that Malone told them he was walking to LaRue to burn the evidence. Officer Musser testified that he found a mustard bottle in Malone's backpack when he searched it. Against L.K.'s testimony and the circumstantial evidence, the jury apparently disbelieved Malone's explanation about the mustard bottle, and we must defer to the fact-finder. State v. DeHass (l967), 10 Ohio St.2d 230, 227 N.E.2d 212. Therefore, a finding that sexual conduct occurred is supported by the evidence. *Page 13 
 {¶ 18} As to whether Malone caused L.K. to submit by force or threat of force, the issue again boils down to a question of credibility. L.K. testified that Brittany was crying when she came back to her bedroom and told L.K. that Malone wanted to have sex with her. L.K. testified that Brittany told her there would "be consequences" if L.K. did not do what Malone wanted. L.K. stated that Malone prevented her from leaving Brad and Brittany's bedroom and that he had his knife unsheathed. L.K. stated that Malone told her to give him what he wanted and then she could leave. She also testified that he threatened to kill her if she did not cooperate. L.K. testified that Malone held the knife in front of her and "brought it up" like he was going to stab her. After they had intercourse, Malone told L.K. to take a shower and douche so the police would be unable to find any evidence. L.K. stated that Malone had his knife with him in the bathroom.
 {¶ 19} Brittany testified that when Malone came into her bedroom, he told her to leave, but she could still hear most of the conversation between Malone and L.K. . Brittany testified that her bedroom was next to the living room, separated by French doors, which had several missing panes of glass. Brittany stated that Malone had his knife in his hand when he told L.K. to do what he wanted so she could leave. She also heard Malone state that he did not want to kill L.K., but he would do it if he had to. Brittany testified that earlier in the evening Malone had shown them a notebook, which contained photographs of three girls, and he had *Page 14 
made comments about killing the girls because they had African-American friends. Brittany also stated that Malone sometimes gets depressed, and when he does, he talks about going to California to become a serial killer with his "dudes."
 {¶ 20} Malone admitted that the knife, which was identified as State's Exhibit 1, was his knife. He stated that he always carries his knife because he lives in a bad area of the city. Malone testified that the knife is for his protection and the protection of others; however, he later testified that he fears nothing in life or death and that he does not care if he gets attacked because a fight between men amounts to the assertion of dominance. Malone stated he believed L.K. was interested in having sex with him because she had been making sexual jokes earlier in the evening. He testified that when they laid on the couch together for a total of approximately one and one-half minutes, L.K. twice told him she was "uncomfortable." Malone testified that he understood her discomfort to be caused by a physical problem, such as a pinched nerve, and not discomfort caused by him or his actions. Malone admitted that he had his knife out of the sheath at some point, but he stated that he had just sharpened the blade, which had been dulled when he used it to open a can of sardines at approximately 7:30 that evening.
 {¶ 21} Malone testified that L.K. agreed to have sex with him if he wore a condom. He refused to wear one, guaranteeing her that she would not get pregnant and that he had no diseases. Malone stated that when he and L.K. were *Page 15 
in his bedroom, he said, "Now, you know my name is Demon and you know I'm carrying a knife. I don't want you to think I'm intimidating you or nothing or whatever. This is your own free choice[,]" and L.K. agreed to have sex with him. Malone then testified about how L.K. undressed first so he could watch her. Malone explained to the jury that he likes to let women undress first:
 that way if I see any twitching, any type of personality or any — anything of uncomfortable ness [sic], because a lot of women will agree with you on something, but then again their actions are so wholly different, I will be like `Okay, I'm cool. I can't do that.' And if they will ask me why I just told you I would, I will make some kind of excuse I want to be with `em, because they agree with one way, but their motions show another.
(Trial Tr., Nov. 6, 2006, at 486). Malone stated that while he had sex with L.K., his knife was in its sheath on his dresser. Malone also admitted that he had the knife in the bathroom because he takes it everywhere for safety reasons.
 {¶ 22} On cross-examination, Malone was asked whether he made L.K. use the mustard bottle to douche. Malone's non-responsive answer was, "When you have consensual sex of two adults agreeing among each other, what's the sense of using a bottle? That's like me saying I put a condom on when I don't wear condoms." (Id., at 492). Malone denied that he ever threatens anybody, especially women, because he is not "into" dominating women, and he stated that he would not force a woman to have sex because in his belief, "women are considered *Page 16 
goddess of man." Malone testified that to violate a woman "would be like condemning my own soul * * * ."
 {¶ 23} Malone testified that L.K. offered no resistance and that he knows of no woman who would fail to fight if she did not want to have sex. R.C. 2907.02(C) states that a rape victim is not required to resist; furthermore, we are aware of no requirement that the victim verbally resist. State v. Miller (Jan. 11, 1995), 3d Dist. No. 4-93-24, unreported. Therefore, L.K.'s seeming lack of resistance is not determinative, and the jury apparently disbelieved Malone's wealth of knowledge about women's tendencies and his compassion toward them. On this record, the jury's verdicts on counts one and three are not against the weight of the evidence.
 {¶ 24} As to count two, kidnapping, the trial court determined that kidnapping was an allied offense of similar import to count one, rape. The trial court dismissed count two, as the state elected to retain the conviction on count one. Accordingly, the first assignment of error is moot as to the kidnapping charge. See generally, State v. Kessler (Jan. 31, 1979), 3d Dist. No. 16-78-5, unreported.
 {¶ 25} As to count eight, tampering with evidence, R.C. 2921.12(A)(1) provides: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, *Page 17 
conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" The bill of particulars alleged that Malone knowingly destroyed evidence, specifically by making L.K. douche to remove evidence of semen, and by burning the sheet, mustard bottle, and Vaseline jar.
 {¶ 26} As indicated above, L.K. testified that Malone used the mustard bottle when he made her douche. L.K. also testified that Malone used the Vaseline for lubrication when he raped her. L.K. testified that Malone put the bed sheet in a plastic bag in his backpack and that he stated he was going to burn the items in the bag. She stated she did not know if he had other items in the bag or not. Brittany testified that Malone told her he was going to walk to LaRue and burn the evidence. She said he specifically mentioned a bed sheet, a mayonnaise bottle, and black riding shorts, and a washcloth L.K. had used in the shower. Brittany testified that Malone told her he had used the mayonnaise bottle to make L.K. douche. However, Brittany testified she did not see the bottle herself. As mentioned above, Officer Musser searched Malone's backpack and found a bed sheet, a mustard bottle, and a jar of Vaseline.
 {¶ 27} Malone himself admitted that he had these materials in his backpack and that he burned them in LaRue, which is approximately 13-14 miles away from Brad and Brittany's apartment. However, Malone explained to the jury that he *Page 18 
had used these materials when he had sex with a different woman on April 7. Malone stated that the other woman had asked him to destroy everything they had used when they had sex, so he was simply upholding his end of the bargain. Malone stated that they had had sex on his sheets, that he had drank her urine from the mustard bottle, and that he had used the Vaseline as a conductor for electrical shocks during intercourse. Malone denied using Vaseline as a lubricant, telling the jury "Vaseline inside of a human being in a womb like that will set you on fire." (Trial Tr., at 487).
 {¶ 28} The weight of the evidence supports that Malone made L.K. douche in order to destroy evidence of semen. The evidence also shows that Malone burned bed sheets, a mustard bottle, and Vaseline, which had been used as part of the rape. The record is also replete with instances of Malone threatening L.K. not to tell the police about the rape, which is discussed more fully below. This evidence indicates Malone's knowledge that an investigation was likely to be initiated in this case. On this record, the jury's verdict of guilty for count eight is supported by the evidence.
 {¶ 29} As to count nine, Malone was charged with and convicted of possessing criminal tools. R.C. 2923.24(A) provides: "No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." Specifically, the state alleged that Malone possessed *Page 19 
a "buck knife," a bed sheet, a mustard bottle, and Vaseline with the purpose to commit one or more offenses. The evidence above indicates that Malone did use the knife, bed sheet, mustard bottle, and Vaseline during the commission of offenses for which he was convicted. At least in regard to the mustard bottle, the jury could, and did, believe that Malone possessed it for the purpose of making L.K. douche. As set forth above, that action constituted rape and tampering with evidence. Although Malone carried his knife for protection, the jury could find that he had intent to use it criminally based on the facts of this case. While bed sheets and Vaseline are normal household items, on this record, the jury could have found that Malone intended to use them for a criminal purpose. Accordingly, the evidence supports the jury's verdict of guilty on count nine.
 {¶ 30} Counts five and six charged Malone with intimidation of an attorney, victim, or witness in a criminal case. Specifically, count five pertained to intimidation of a victim, L.K., and count six pertained to intimidation of a witness, Brittany. R.C. 2921.04(B) states: "No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties of the attorney or witness." *Page 20 
 {¶ 31} The evidence in this case supports the jury's verdict on count five. L.K. testified that while she was in the bathroom, Malone threatened that he or his "dudes" would kill her mom so that she would have to identify her mother's body if she reported the rape. L.K. testified that Malone also threatened to kill her if she told anybody about the rape. L.K. stated that when she went into Brad and Brittany's bedroom with them, Malone told her she could leave, but warned her not to report the offense or he or his "dudes" would find her. Brittany corroborated L.K.'s testimony. Brittany testified that Malone told her not to tell anybody about the offense and that if the police or any attorneys asked her about it, she was supposed to say she had been asleep. Brittany testified that Malone told her her life would be in danger if she did otherwise. Brittany also testified that she is familiar with Malone, and he was serious when he made the threats.
 {¶ 32} As mentioned above, Malone denied making any threats. Brad testified that Malone did not threaten anybody and that Malone would not threaten him. He stated that he had not been threatened during the proceedings. Brad also testified that he had told the grand jury he knew nothing about the rape, and then he said what the prosecutor wanted to hear so he could leave. However, Brad's credibility had been called into question on numerous occasions. L.K., Brittany, and Malone all testified that Brad makes strange comments. There was testimony that Brad was not on his medications, and Brad's father testified that there was a *Page 21 
very marked difference in Brad's personality depending on whether he was taking his medications. During trial, some of Brad's answers were unresponsive, argumentative, or strange. For example, as soon as he was sworn in, the following exchange occurred between him and Malone's attorney:
 Q: Brad, could you please state your name and address for the record?
 A: I don't have a current address.
 Q: Okay. What's your name?
 A: According to the commercial I seen you're not supposed to go by any true name.
 Q: What was your name given to you on your birth certificate?
 A: I guess it was Bradley Brown.
(Trial Tr., at 538). On this record, the jury could have easily discredited, and apparently did discredit, Brad's testimony. The jury apparently found Brittany and L.K.'s testimony more credible than Malone's, thereby finding that Malone had threatened L.K. in an attempt to intimidate her and prohibit her from reporting the rape to the police. The evidence in this record supports the jury's verdict.
 {¶ 33} Although Malone's assignment of error as to count six challenges the weight of the evidence, and he has not assigned as error the sufficiency of the evidence, we may recognize plain error sua sponte to prevent a miscarriage of justice. State v. Conklin, 2nd Dist. No. 1556, 2002-Ohio-2156; citing Crim.R. 52(B). For the reasons expressed below, there was insufficient evidence to convict Malone of intimidating a witness. "[S]ufficiency of the evidence is a test of *Page 22 
adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law * * * ." State v. Wilson, 113 Ohio St.3d 382,2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 25, citing Thompkins, at 386-387.
 {¶ 34} In count six, Malone was charged with and convicted of intimidation of a witness. R.C. 2921.04(B) states in pertinent part: "No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder * * * [a] witness involved in a criminal action or proceeding in the discharge of the duties of the * * * witness." R.C. 2921.22 imposes a duty on people who witness a felony offense to report the offense. Therefore, in the general sense, a witness who reports an offense to law enforcement is discharging their statutory duty as a witness. However, the intimidation statute requires that the witness be involved in acriminal action or proceeding.
 {¶ 35} R.C. 2901.04(A) states that criminal statutes "shall be strictly construed against the state, and liberally construed in favor of the accused."
 It is well accepted that the cornerstone of statutory construction and interpretation is legislative intention. * * * In order to determine legislative intent it is a cardinal rule of statutory construction that a court must first look to the language of the statute itself. * * * "If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary." * * * Moreover, it is well settled that to determine the intent of the General Assembly "`it is the duty of this court to give effect to the words used [in a statute], not to delete words used or to insert words not used.'" * * * A *Page 23 court may interpret a statute only where the words of the statute are ambiguous.
(Emphasis sic.). State v. Jordan, 89 Ohio St.3d 488, 491-492,2000-Ohio-225, 733 N.E.2d 601, internal citations omitted.
 {¶ 36} The Revised Code does not define the term "criminal action" nor does it define the term "criminal proceeding." Several appellate districts have upheld convictions for intimidating a witness when the threats were made prior to any investigation by the police. In those cases, the courts equated a witness to a criminal act to a witness involved in a criminal action or proceeding. State v. Gooden, 8th Dist. No. 82621, 2004-Ohio-2699; State v.Hummell (Jun. 1, 1998), 5th Dist. No. CA-851, unreported. We do not believe the terms "criminal action" and "criminal proceeding" are synonymous with the term "criminal act."
 {¶ 37} The Tenth District Court of Appeals has analyzed the distinction between "actions" and "proceedings." State ex rel. Towler v.O'Brien, 10th Dist. No. 04-AP-752, 2005-Ohio-363. Although the court was faced with interpreting R.C. 149.43, its reasoning is instructive.
 For "action" the definition "includes all the formal proceedings in a court of justice attendant upon the demand of a right made by one person of another in such court, including an adjudication upon the right and its enforcement or denial by the court." * * * "Proceeding" is the "[r]egular and orderly progress in form of law, including all possible steps in an action from its commencement to the execution of judgment." *Page 24 
O'Brien, at ¶ 16, quoting Black's Law Dictionary (6 Ed.Rev. 1990) 28, 1204. See also State ex rel. Steckman v. Jackson (1994),70 Ohio St.3d 420, 432, 639 N.E.2d 83. A "criminal act," as evidenced by the decisions in Hummel and Gooden, is the illegal behavior engaged in by the defendant. Clearly, for a "criminal action" or "criminal proceeding" to exist, there must be some type of government involvement.
 {¶ 38} If the legislature had intended to make the intimidation statute applicable to witnesses prior to the initiation of a criminal "action" or "proceeding" the appropriate language could have been easily included. We note that the state apparently charged intimidation of a witness much like it charged tampering with evidence; that is, assuming that the defendant had knowledge that an investigation would ensue. R.C.2921.12(A)(1). Tampering with evidence requires knowledge by the defendant that an "official" investigation or proceeding will follow. A similar mens rea requirement is not expressed in the intimidation statute, at least as it pertains to a witness. R.C. 2921.04(B) specifically prohibits a person from intimidating a victim before charges are filed, but requires a witness to be involved in a criminal action or proceeding.
 {¶ 39} Other courts have upheld convictions for intimidation of a witness after the police have begun an investigation. See State v.Block, 8th Dist. No. 87488, 2006-Ohio-5593. While we do not establish a bright-line test for when a *Page 25 
criminal action or proceeding begins, at the least, threats made prior to any involvement by law enforcement are insufficient to constitute intimidation of a witness pursuant to the clear and unambiguous language of the statute. Since Malone threatened Brittany prior to any police investigation or prosecution in this case, at the time of threat, Brittany was merely a witness to a criminal act and not a witness involved in a criminal action or proceeding under R.C. 2924.04(B). As such, there is insufficient evidence to support the jury's conviction on count six. Since the result of trial would have been otherwise had the error not occurred, plain error has resulted. Conklin. See State v.Pelfrey, 112 Ohio St.3d 422, 2007-Ohio-256, 860 N.E.2d 735, at ¶ 32, quoting State v. Moreland (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, citing State v. Long (l978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus ("[p]lain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise.").
 {¶ 40} Consistent with this opinion, the first assignment of error is sustained, and the second assignment of error is overruled. The judgment of the Marion County Common Pleas Court is affirmed as to counts one, three, five, eight, and nine and reversed as to count six only.
 {¶ 41} Because this decision is in conflict with State v. Gooden, 8th Dist. No. 82621, 2004-Ohio-2699, and State v.Hummell (Jun. 1, 1998), 5th Dist. No. *Page 26 
CA-851, unreported, we certify the record of this case to the Ohio Supreme Court for review and final determination on the following question: Is a conviction for intimidation of a witness under R.C.2921.04(B), which requires the witness to be involved in a criminal action or proceeding, sustainable where the intimidation occurred after the criminal act but prior to any police investigation of the criminal act, and thus, also prior to any proceedings flowing from the criminal act in a court of justice?
Judgment affirmed in part and reversed in part.
ROGERS, P.J., concurs.
[1] Count Two contained a sexual motivation specification, and Counts One, Two, and Three contained Sexually Violent Predator specifications.