[Cite as *State v. Haynik*, 2023-Ohio-717.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                No. 111769

    v.                                 :

LARRY HAYNIK,                          :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 9, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-648064-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Adrienne E. Linnick and Chauncey Keller, Assistant Prosecuting Attorneys, *for appellee*.

Patituce & Associates, LLC and Catherine Meehan, *for appellant*.

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Larry Haynik was found guilty of rape after a bench trial. On appeal, he challenges the sufficiency of the evidence presented by the state to prove his guilt and also argues his conviction is against the manifest

weight of the evidence. In addition, he claims the state improperly introduced expert testimony from a police officer who investigated the rape case. After a careful review of the record and applicable law, we find no merit to Haynik's claims and affirm the trial court's judgment.

{¶ 2} Haynik and the victim, A.S., had a tumultuous, off-and-on relationship. On October 28, 2019, A.S. and a friend spent time together drinking and working on an art project at A.S.'s new apartment, which she recently moved into after leaving the residence she and Haynik shared. During the evening, Haynik repeatedly called and texted A.S. and A.S. eventually gave him her new address. When Haynik appeared at her apartment later that night, A.S.'s friend let him in with A.S.'s permission. While her friend was asleep in the living room, A.S. and Haynik were talking in her bedroom. The conversation turned into an argument, and as A.S. testified at trial, Haynik raped her and then damaged property in her apartment before leaving. The next morning, A.S. went to her ex-husband's home and told him about the incident and they went to the hospital for a rape kit to be collected. A.S. also filed a police report. Haynik claimed in a statement to the police that they engaged in consensual sex twice that evening.

{¶ 3} Haynik was subsequently indicted for one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree. He waived his right to a jury trial, and the rape case was tried to the bench.

**Trial Testimony**

{¶ 4} A.S.'s friend Rhonda M., A.S. herself, her former husband Lonnie S., the SANE nurse who examined her at the hospital, and two police officers from the Westlake Police Department testified for the state.

**a. A.S.'s Friend**

{¶ 5} A.S.'s friend, Rhonda, testified that on the night of the incident, A.S. invited her to celebrate her breakup from her relationship with Haynik, a new beginning for her life, and her new apartment in Westlake. Rhonda brought art supplies and alcohol to the apartment, and they planned to work on an art project together while consuming alcohol. Later in the evening, they went to a neighborhood bar and consumed additional alcohol. Throughout the evening, A.S. received phone calls and text messages from Haynik. She recalled that when they were back at A.S.'s apartment, she heard a knock at the door and A.S. told her to let the individual at the door in. She did not know who it was, and after letting him in, she quickly went to sleep on the floor in the living room.

{¶ 6} Rhonda woke up early in the morning because she was sore from sleeping on the floor and was anxious to go home to sleep on her own bed. She remembered A.S. helped carry her belongings to her car, but not much else. She did not remember seeing anyone else in the apartment. Later in the day, she and A.S. talked over the phone and she found out about the incident. She testified that "I felt bad, because I was there and I didn't help her." She subsequently was interviewed

by the police and provided a statement, stating that she did not hear or see anything during the night.

**b. A.S.**

{¶ 7} A.S. testified at length about her tumultuous, "on-again, off-again" relationship with Haynik over the course of two years. She met Haynik in 2017 at her niece's wedding. The relationship began as a "one-night stand," and within a few months, he moved into her apartment. She stated that "[w]hen things were good with Larry Haynik, they were amazing. When they weren't, when he wasn't happy, nobody was happy." She described him as "controlling" and their relationship as "violent" and filled with drugs and alcohol.

{¶ 8} Haynik would call her obsessively — sometimes five, ten, or 20 times a day — to check on her or to berate her for not doing what he wanted her to do. When he got upset, he would become abusive, such as pouring alcohol over her head, spitting on her, and calling her a slut, whore, or bitch. A.S. recounted an incident in 2018 where he became angry because she wanted to go to an event at Edgewater Park by herself. He threw a fit and, while she was gone, bleached every piece of her clothing. He also used a knife to carve a word, either "whore" or "slut," into her dining room table. She reported the incident to the police. She recalled another incident where Haynik screamed at her and spit in her face when she told him she was going to stay with a friend who is gay.

{¶ 9} A.S. asked Haynik to move out but he refused, so she moved out and stayed with her ex-husband. During this time, Haynik would call her ten, 20, or 30

times daily, playing love songs in the background. She eventually gave in and moved back in with him. She left again, however, and this time she had to call the police for assistance because Haynik would not let her collect her belongings. A week after she left, he resumed calling her and playing love songs over the telephone and promised her that their relationship would get better. After several weeks, she moved back in with him again.

{¶ 10} Over the following four months, she felt like she was walking on eggshells whenever Haynik did not get his way. They fought physically one day at the end of summer of 2019. She was cleaning her vehicle and did not answer a phone call from him. When he came home, she called him "a little bitch" and he hit her. She hit him back but, as she testified, "the man's got a hundred pounds on me, so [she] was on the ground being hit." Two weeks later, she left him again. She waited until he went to work and, with a neighbor's help, packed up as much of her belongings as possible and went to stay with her ex-husband.

{¶ 11} A.S. subsequently moved into an apartment in Westlake. She and Haynik continued to argue about their relationship by phone calls and text messages. Several weeks before the incident at issue, she took care of his dog when he was out of town. When he returned, they had dinner together and engaged in consensual sex.

{¶ 12} On the night of the incident, she was spending time with her friend Rhonda in her new apartment, doing an art project and drinking. Around nine or ten p.m., A.S. and Rhonda went to a bar next to her apartment. During the entire

evening, Haynik was constantly calling and sending text messages to her. She ignored most of them. While at the bar, however, she texted him the address of her new apartment; as she testified, he kept asking where she was and she thought that he wanted to know out of concern for her safety because she had been drinking. On cross-examination, she admitted that Haynik would show up if he knew where she was, because "that's just what he does."

{¶ 13} A.S. and Rhonda stayed at the bar until it closed at one a.m. Back at her apartment, she opened another alcoholic beverage to drink. She admitted she had consumed more than ten alcoholic beverages by this time. There was a knock at the door. Rhonda opened the door, and Haynik was there. A.S. gave Rhonda permission to let Haynik in. Afterward, Rhonda laid on the floor and quickly fell asleep. A.S. and Haynik then went to her bedroom to talk about their relationship. He wanted her to come back to live with him. She told him she was with someone else now, and he must stop pursuing her. As she testified:

> And then I'm standing in front of him and he kind of reaches out his arm and says, "I'm gonna to make love to my woman." And I have a onesie on, pajama set onesie, and it rips. And I say, "No, no, you're not." And then he has sex with me. * * * I mean that he put me on my back and he had sex with me, penetrated. I don't yell "Help." I don't say "No." I don't stop it. I let it run its course, because I just want him to leave, and I think he's gonna leave after this.

**{¶ 14}** On cross-examination, A.S. added that after Haynik said he wanted to "make love to his woman," she said "no" and pulled way and that was when the zipper broke.[1]

**{¶ 15}** After the sexual act, Haynik did not leave immediately. He continued to talk to A.S., and when he got angry with her again, he put burn holes in the carpet with his cigarettes and stabbed her air mattress with a knife. He also held her down

---

[1] Regarding whether A.S. said "no," on cross-examination, the defense questioned A.S. on her medical records, in which the SANE nurse wrote that A.S. told her she did not say "no." The transcript reflects the following testimony by A.S.:

DEFENSE ATTORNEY: Can you read [the medical records] and tell me if that refreshes your memory?

A.S.: "Patient in for complaint of sexual assault by ex-boyfriend last night. * * * Patient states she went to her ex-best friend's house and to his bedroom where they had sex. She just laid there. Patient states she did not say no, but "that I just laid there." * * *

DEFENSE ATTORNEY: That would be incorrect, right?"

A.S.: That is — that's not correct. I mean, that is correct, but that's not correct. I didn't say anything as I laid there, no. I didn't.

Pointing to this testimony, Haynik argues that A.S. admitted she did not say "no" before the sexual act and "just laid there." Our review, however, reflects that this testimony is consistent with A.S.'s testimony on direct examination that after she said "no" to Haynik's sexual advance, he ripped her pajama and put her on the air mattress, and she did *not* continue to verbally or physically resist him. We note, however, that her statement to the SANE nurse regarding where the incident occurred was inconsistent with her testimony, but the inconsistency was not further explored by the defense.

with his forearm on the front of her body and "put sucker bites all across [her] neck to show [her] boyfriend that [she's] taken."

{¶ 16} Haynik also started to call her a whore and a slut, and she raised her voice, telling him, "You better get out, you get out, you leave." After he left, Rhonda woke up and immediately wanted to go home to sleep on her own bed. After Rhonda left, A.S. thought to herself, "What just happened?" She kept thinking, "I know I said no." She testified she did not tell Rhonda what happened because she was still in shock; Rhonda left quickly after she awoke, and A.S. did not have time to think about what to tell her.

{¶ 17} After Rhonda left, A.S. went to her ex-husband's house and told him what happened. He first dropped off their son at school around 8:30 a.m. and then took her to the hospital for the collection of a rape kit. She was interviewed by the police while at the hospital.

{¶ 18} During her direct examination, the state introduced several exhibits consisting of text messages between A.S. and Haynik on that evening. At 11:27 p.m., A.S. texted Haynik the address of her new apartment. At 6:19 a.m., she texted him: "Don't ever come near me again. I'm filing harassment charges on you today, then I'm going to file a restraining order. I will never come back to you." He texted her at 7:28 a.m.: "Just keep fucking your son's friend." At 8:57 a.m., she texted him: "I'm going to the emergency room. You raped me. I said no." He responded immediately: "We made love." At 8:59 a.m., he texted: "We did it two times" and then at 10:22 a.m.: "Why would you say such an untrue statement? If you told me

no, we wouldn't have done it two times.  You really are sick and a narcissist."  At 10:23 a.m., he texted: "Just go and keep fucking your son's friend."  At 12:33 a.m., he texted: "Why would you make such a horrible false accusation?  All because I ruined some carpet and I was at your place because you told me to come?  We made love two times.  I pulled out and you started kissing it.  Get real.  The materialistic things I damaged can be easily replaced.  * * *."

{¶ 19}  In addition to the text messages, during A.S.'s direct examination, the state also introduced A.S.'s pajamas as an exhibit.  It was a onesie pajama with a zip-up from the neck to the feet.  A.S. testified that Haynik ripped the front zipper of the pajamas.

{¶ 20}  On cross-examination, A.S. denied she wanted Haynik to come to her apartment even though she provided her new address to him in a text message.  She testified that she did it because she felt he needed to know where she was out of concerns for her safety.  When pressed further, however, A.S. admitted that she knew he would show up at her residence once he knew where she was, but she vehemently denied she wanted to have sex with him, and she said no when he asked for it.

**c. A.S.'s Ex-Husband**

{¶ 21}  A.S.'s ex-husband Lonnie testified that he was married to A.S. for over 18 years and they have three children together.  His wife remained his best friend

even after their divorce, and they would communicate with each other a few times each week. At the time of the incident, the divorce was not yet finalized.

{¶ 22} Lonnie provided a statement to the police regarding the instant incident. A.S. came to his residence around 7:30 a.m. on October 29, 2022. He noticed that she pulled her legs up on the chair and cradled herself while rocking back and forth, which, to him, indicated that something was seriously wrong. She brushed her hair to show him the hickeys on both sides of her neck. She was very distraught but tried hard not to cry in front of their youngest son, who was getting ready to go to school. She briefly told him what happened and, after they took their son to school, gave him more details about what occurred. He was in shock. They went back to her apartment to pick up the pajamas and then went to the hospital for a rape kit.

### d. SANE Nurse and Police Officers

{¶ 23} The SANE nurse attending to A.S. at the hospital testified that she performed an examination of A.S. at the hospital after the police made a report of the incident. She did not observe tears or rips in A.S.'s genitalia but observed hickeys on her neck.

{¶ 24} Officer Paul Hartranft of the Westlake Police Department testified that he responded to a call from the SANE nurse regarding a rape. He interviewed

A.S. and then received from the SANE nurse the rape kit and the pajamas as evidence for the case.

{¶ 25} Sergeant Nathan Fox, a 15-year veteran with the Westlake Police Department, testified that he was trained and certified for sexual assault cases and he had worked on over 60 such cases. He took photographs of A.S.'s bedroom and collected a comforter for evidence. Later, he was assigned to the case after the prior detective on the case retired. He had reviewed all the documents and evidence in the case. He testified that both the DNA buccal swabs from A.S.'s boyfriend and Haynik were submitted for testing and the DNA located in the rape kit was from the latter. He also testified that his review of Haynik's phone records corroborated A.S.'s testimony regarding his excessive calls to her. His review showed that on one occasion, Haynik made more than 50 calls to her within two hours.

{¶ 26} Sergeant Fox testified that he reviewed A.S.'s medical records regarding the incident and there were no injuries to A.S.'s genitalia noted in the records. He testified, however, that "[i]njuries don't really indicate much other than sometimes excessive force," adding that "I've had many sexual assault cases where there's actually no injuries, and many where there's devastating injuries."

{¶ 27} Regarding A.S.'s pajamas, Sergeant Fox testified that "significant tearing and breakage of the zipper was noted in the photographs (of the pajamas)," consistent with A.S.'s allegation that the pajamas were forcibly removed. The

prosecutor held up the pajamas for Sergeant Fox to show where the tearing was in the pajamas.

{¶ 28} Haynik did not testify, but he provided a statement to the police, which the defense asked Sergeant Fox to read on cross-examination. In the statement, Haynik provided a vastly different account of the event. According to his statement, A.S. moved out of his residence a month before the incident, but they were working on their relationship. In the month of October 2019, "[they] slept together three more times, including October 28, 2019." That evening, he went to A.S.'s residence at 11:45 p.m. after she texted him her new address. After being let in the apartment by Rhonda, he went to her bedroom and she began kissing him and engaged in oral sex with him, and then they had consensual intercourse, with her on top. They then argued about her new boyfriend, and she promised him not to see him again. They started making love again, and while engaged in oral sex with him, his mother called. According to Haynik, A.S. said "Hi Mom" to her. Haynik also stated that A.S. liked "rough sex"; she was moaning and laughing while he gave her hickeys, and she never screamed or said "no." After the sexual conduct, he got mad again because she refused to move back in with him. He poked a hole in the air mattress. They argued but made up before he left. She walked him to the door and hugged him good-bye, which was witnessed by Rhonda.

{¶ 29} Haynik stated that he left A.S.'s apartment "feeling love and had hope for [their] future." He woke up in the morning to see nasty messages from her, but it was after he texted "keeping sleeping with your son's friend" that she accused him

of rape. He denied raping A.S., stating that "[e]verything was totally consented and loving. She enjoyed it and 'orgasmed' twice."

{¶ 30} The defense questioned Sergeant Fox concerning the lack of investigation regarding Haynik's claim that his mother called him when he and A.S. engaged in sexual conduct. Sergeant Fox acknowledged that the prosecutor interviewed Haynik's mother several days before the trial and his mother indicated she talked to A.S. as Haynik alleged. Sergeant Fox, however, testified that nothing in that interview was relevant to whether a rape occurred or not.

{¶ 31} The defense did not call any witnesses to testify and moved for acquittal pursuant to Crim.R. 29, which the trial court denied. The trial court found Haynik guilty of rape in violation of R.C. 2907.02(A)(2).

{¶ 32} At sentencing, A.S. made a victim impact statement. Haynik and several family members also addressed the court, all vehemently proclaiming his innocence. The court stated that, in finding Haynik guilty, it found A.S. credible and

believed her version of the event. Haynik was sentenced to an indefinite sentence of five to seven-and-a-half years for his offense under the Reagan Tokes Law.

{¶ 33} On appeal, Haynik raises the following assignments of error:

I. The state failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt.

II. Appellant's conviction was against the manifest weight of the evidence.

III. The State of Ohio improperly introduced expert testimony from Sergeant Fox to the prejudice of appellant and deprived him of his right to a fair trial.

IV. The trial court erred in imposing an indefinite term as the Reagan Tokes Law violated appellant's constitutional right to due process under the Fourteenth Amendment to the United States Constitution and Article I Section 10 of the Ohio Constitution.

**Sufficiency and Manifest Weight of the Evidence**

{¶ 34} When reviewing a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

Haynik was convicted of forcible rape as defined in R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 35} The issue presented in this appeal is whether the state proved that Haynik compelled A.S. to submit to sexual conduct by force or threat of force. "Force" is statutorily defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 36} We first note that "[t]he force element of R.C. 2907.02(A)(2) is the extrinsic force used to compel the victim's submission to sexual conduct; it is not the sexual conduct itself." *State v. Hartman*, 8th Dist. Cuyahoga No. 105159, 2018-Ohio-2641, ¶ 29 (Stewart, J., concurring in part and dissenting in part). *See also State v. Griffith*, 10th Dist. Franklin No. 05AP-1042, 2006-Ohio-6983, ¶ 17 (to prove the force element of a sexual offense, the state must establish force beyond that force inherent in the crime itself). Force, however, "can be inferred from the circumstances surrounding sexual conduct * * *." *State v. Schaim*, 65 Ohio St.3d 51, 55, 600 N.E.2d 661 (1992). The "force" element of R.C. 2907.02(A)(2) is demonstrated through the evidence that the force was sufficient to overcome the victim's will. *State v. Rucker*, 2020-Ohio-2715, 154 N.E.3d 350, ¶ 17 (8th Dist.), citing *State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 50, citing *State v. Eskridge*, 38 Ohio St.3d 56, 59, 526 N.E.2d 304 (1988).

{¶ 37} Here, A.S. testified that Haynik said, "I am going to make love to my woman" and she said, "no, no you're not." He ripped the front zipper of her pajama

while she pulled away.  He then put her on her back on the mattress and penetrated her.  This testimony was sufficient evidence to prove that Haynik purposely compelled A.S. to submit to sexual conduct by force.

{¶ 38} Haynik argues that there was insufficient evidence for forcible rape because A.S. admitted that she did not yell "help," or say "no" or "stop it" during the sexual conduct.  While A.S. did not continue to protest after the initial "no" or attempted to fight off Haynik, such testimony from a victim is not required for proof of rape under R.C. 2907.02(A)(2).  "A victim need not prove physical resistance to the offender in prosecutions under this section." R.C. 2907.02(C).  This court has also noted that, under Ohio law, there is no requirement that a victim resist in order to prove the use of force.  *State v. Poole*, 8th Dist. Cuyahoga No. 107829, 2019-Ohio-3366, ¶ 33, citing *State v. Malone*, 3d Dist. Marion No. 9-06-43, 2007-Ohio-5484, ¶ 23 ("[W]e are aware of no requirement that the victim verbally resist."), and *State v. Shannon*, 11th Dist. Lake Nos. 2002-L-007 and 2002-L-008, 2004-Ohio-1669, ¶ 94 ("[A] victim is not required to prove physical resistance in a rape prosecution."). *See also Ohio v. Redmond*, 8th Dist. Cuyahoga No. 111138, 2022-Ohio-3734, ¶ 25 (no requirement that the victim resist for the defendant's act to be forceful).

{¶ 39} Viewing the evidence presented at trial in a light most favorable to the prosecution, therefore, we find that any rational trier of fact could have found the elements of rape defined in R.C. 2907.02(A)(21) proven beyond a reasonable doubt,

specifically, that Haynik compelled A.S. to engage in vaginal intercourse by force sufficient to overcome her will. The first assignment of error lacks merit.

**Manifest Weight of the Evidence**

{¶ 40} While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins,* 78 Ohio St.3d at 386-387, 678 N.E.2d 541. The test for sufficiency requires a determination of whether the state has met its burden of production at trial; a manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins.* Unlike a claim that the evidence is insufficient to support a conviction, which raises a question of law, manifest-weight challenges raise factual issues. "Under the manifest weight-of-the-evidence standard, a reviewing court asks the following question: whose evidence is more persuasive — the state's or the defendant's?" *State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86. When a defendant argues his or her conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 41} Haynik points to A.S.'s testimony that she provided him with her address on the night of the incident knowing he would show up and that she instructed her friend to let him in when he appeared at her apartment. He argues that these circumstances, coupled with the parties' relationship — which began with a one-night stand and included a consensual sexual act just weeks before the incident — indicate the sexual act on the night of the incident was consensual, especially in light of the fact that A.S. did not immediately call 911 to report the incident and did not accuse him of rape immediately in their text messages exchanged later that morning. As proof of consensual sex, he also points to his text message in response to her allegation of rape, where he stated "we made love" and "why would you say such an untrue statement? If you told me no, we wouldn't have done it two times."

{¶ 42} A.S. testified at length regarding the incident and was subject to rigorous cross-examination by the defense. Her testimony indicates that she said "no" when Haynik said "I'm gonna to make love to my woman." He ripped the zipper of her onesie pajama, put her on the mattress, and engaged in vaginal intercourse with her. After the sexual assault, he put multiple hickeys on her neck against her

will and also put burn holes in the carpet and stabbed the air mattress. The ripped pajamas, which corroborates A.S.'s testimony, was admitted as evidence at trial.

{¶ 43} While Haynik points out certain inconsistencies in A.S.'s testimony such as her statement to the SANE nurse that the incident occurred in her "ex-best friend's" house, we note that, in a bench trial, "the court may take note of any inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony.'" *State v. McCall*, 8th Dist. Cuyahoga No. 104479, 2017-Ohio-296, ¶ 14, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 44} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the witnesses' credibility, we are unable to conclude that the trial court, in resolving conflicts in the evidence, clearly lost its way and created such a manifest miscarriage of justice that a new trial should be ordered. Our review does not indicate that this is an exceptional case where the evidence weighs heavily against the conviction. The second assignment of error is without merit.

**Allegation of Improper Expert Testimony**

{¶ 45} Under the third assignment of error, Haynik argues the trial court improperly permitted Sergeant Fox to testify as an expert in violation of Evid.R. 702(A). The trial transcript reflects that, after Sergeant Fox testified that his

review of the medical records did not show injuries to A.S.'s genitalia, the state elicited the following testimony:

> PROSECUTOR: Okay. In your experience in dealing with sexual assault cases, injuries to genitalia, what, if anything, do you draw from that in your investigation, injuries or lack therefore?
>
> SERGEANT FOX: In sexual assault cases [it's] not really atypical for injuries or lack thereof. I've had many sexual assault cases where there's actually no injuries, and many where there's devastating injuries. So injuries don't really indicate much other than sometimes excessive force.

{¶ 46} Haynik argues Sergeant Fox's testimony should not be permitted under Evid.R. 702, which governs expert testimony, because Sergeant Fox was not qualified as an expert. We note that Haynik did not object to the testimony he now challenges on appeal. As such, we review the issue for plain error. As we explain in the following, Sergeant Fox's testimony was permissible under Evid.R. 701 as opinion testimony by a lay witness and, therefore, there was no error in the admission of his testimony, plain or otherwise.

{¶ 47} Evid.R. 701 states:

[I]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶ 48} "Under Evid.R. 701, courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 74. As the Supreme Court of Ohio explained, the propriety of

opinion testimony by a lay witness is based on a layperson's personal knowledge and experience, rather than on specialized knowledge contemplated in Evid.R. 702. *State v. McKee*, 91 Ohio St.3d 292, 297, 744 N.E.2d 737 (2001).

{¶ 49} This court has always recognized that a state's witness not presented as an expert can properly testify under Evid.R. 701 when "(1) the testimony is based on the witness's training or experience, (2) the testimony relates to the witness's personal observations with the investigation, and (3) the testimony is helpful to determine a fact at issue." *State v. Calhoun*, 8th Dist. Cuyahoga No. 105442, 2017-Ohio-8488, ¶ 34, citing *State v. Wilkinson*, 8th Dist. Cuyahoga No. 100859, 2014-Ohio-5791, ¶ 52-53; *Primeau* at ¶ 75; and *State v. Cooper*, 8th Dist. Cuyahoga No. 86437, 2006-Ohio-817, ¶ 18.

{¶ 50} Pursuant to Evid.R. 701, "if testimony is based on an officer's training and experience, related to the officer's personal observations during an investigation, and helpful to determine facts in issue, the testimony is properly admitted as lay testimony under Evid.R. 701." *State v. Ladson*, 8th Dist. Cuyahoga No. 111211, 2022-Ohio-3670, ¶ 45, quoting *State v. Harris*, 8th Dist. Cuyahoga No. 108624, 2020-Ohio-4461, citing *State v. Maust*, 8th Dist. Cuyahoga No. 103182, 2016-Ohio-3171, ¶ 18.

{¶ 51} Here, Sergeant Fox, a police officer with the Westlake Police Department for 15 years, first testified regarding the training and certifications he had received, which included advanced sexual assault training, and that he had handled over 60 sexual assault cases. He testified that he became the lead detective

in this case when the prior lead detective retired and that he has fully reviewed the matter. Where a law enforcement officer "testified as a lay witness to opinions based on his experience as a police officer, his previous investigations, and his perception of evidence at issue," the first prong of Evid.R. 701 is satisfied. *Harris* at ¶ 51, citing *State v. Walker-Curry*, 8th Dist. Cuyahoga No. 106228, 2019-Ohio-147, ¶ 12, citing *State v. Grajales*, 5th Dist. Delaware No. 17CAC030020, 2018-Ohio-1124, ¶ 64. Moreover, Sergeant Fox's testimony based on his knowledge and experience in sexual assault cases was helpful to determine a fact at issue regarding whether sexual assault victims always sustain injuries to their genitalia.

{¶ 52} "Evid.R. 701 affords the trial court considerable discretion in controlling the opinion testimony of lay witnesses." *Harris* at ¶ 54, quoting *Grajales* at ¶ 60. Accordingly, even if the error were properly objected to and preserved for our review, we would find that the trial court did not abuse its discretion in admitting Sergeant Fox's testimony under Evid.R. 701. There was no error, plain or otherwise. The third assignment of error is overruled.

**Reagan Tokes Law**

{¶ 53} Under the fourth assignment of error, Haynik claims the trial court erred in imposing an indefinite sentence under the Reagan Tokes Law because the law violates the separation-of-powers doctrine and his right to due process. In *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 538 (8th Dist.) (en banc), this court

addressed arguments similar to those raised by Haynik in this appeal and found the Reagan Tokes Law constitutional. The fourth assignment of error is overruled.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
MICHAEL JOHN RYAN, J., CONCUR